**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Charles Russell,

                     Plaintiff,         File No.03-4889 (PAM/SRN)

vs.                            **DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Hennepin County, and Sheriff Patrick D. McGowan, Chief Deputy Michele Smolley, Inspector Thomas Merkel, and Former Inspector Richard Estensen, officially and individually,

                     Defendants.

---

## INTRODUCTION

Plaintiff sued four individuals and Hennepin County for "overdetention" arising from his incarceration at the Hennepin County Adult Detention Center ("ADC") in November 2000. His Complaint asserts claims under the federal and state constitutions and the common law of false imprisonment. Defendants are entitled to judgment on all claims.

## STATEMENT OF FACTS

On or about August 8, 2000, a complaint-warrant was filed in Hennepin Count District Court charging plaintiff with the felony crime of terrorist threats. (Beitz Aff. Ex.H). The warrant set bail at $20,000 along with requirement for "CR INTENSIVE", or conditional release with intensive supervision. (*Id.* p. 3). On or about September 26, 2000, plaintiff was arrested pursuant to the warrant, brought to the ADC and booked. (Johnson Aff. Ex.D). Plaintiff made his first appearance in court on September 27, 2000, and bail was revised to $10,000 with conditional release and no contact with the victim. (Beitz Aff. Ex.I, p. 1).

Plaintiff had appearances scheduled on October 19 and 20, 2000 for a pretrial conference which was again continued until November 9, 2000. (*Id.*) On November 9, 2000, plaintiff appeared before the Honorable Bruce Hartigan for a pretrial conference during which the plaintiff entered a plea of guilty. The computerized court records indicated that bail was revised so that no bail was required ($ __), but the record still reflected "conditional release," and "no contact with the victim." Additionally, a pre-sentence investigation was ordered and the matter was "referred to probation." (*Id*.) After the hearing, plaintiff was returned to his housing unit at the ADC, arriving back there at approximately 3:40 p.m. (Johnson Aff. ¶10).

Plaintiff testified that he understood that he was to have been released unconditionally on November 9, and that after his return to the jail he spoke with the housing deputies on a daily basis and also communicated with them via an "inmate request" form, commonly known as a "green slip," asking when he would be released. He states that the deputies essentially did nothing except to threaten that if he created further disturbances, he would be "placed in the hole." (Beitz Aff. Ex. K p. 37 line 25- p. 39 line 16; p. 41 line 14- p. 42 line 12; p. 43 line 4 – p. 44 line 15; p. 47 line 2-p 48 line 17; p. 49 line 21 – p. 52 line 19). Plaintiff spoke with a trustee who recommended that he call his attorney. He made two calls before he reached his attorney, either on November 12th (*Id.* p. 54 lines 6-23) or November 14th (*Id*. p. 57 lines 2-12). He was released the day after he spoke with his attorney.( *Id*. p. 53 line 25 – p. 55 line 20).

ADC records confirm only that plaintiff sought information via two green slips: the first one dated 11-10, (Johnson Aff. Ex.C-4) in which the plaintiff states that he had been "released from custody yesterday;" wondered why he was still confined; and asked what the

procedure was. It reflects further, that the deputy noted at 8:00 a.m. that he talked to plaintiff and "explained the process," (*Id.*) presumably referring to the process by which probation would meet with the plaintiff to sign him out on conditional release, as described below. Plaintiff denied that this response was given to him. (Beitz Aff. Ex. K. p. 63 line 11-p. 64 line 20). The second greenslip, dated 12-10 (sic) was received on November 11, 2000, by Deputy T. Bush at 3:30 p.m., indicates that Deputy Bush responded that same day at 6:45 p.m., and told the plaintiff that he needed to be signed out by probation. (Johnson Aff. Ex. C-5). Plaintiff also denies that this conversation occurred. (Beitz Aff. Ex. K. p. 64 lines 13-25). Although the ADC has three other green slips from plaintiff pre-dating November 10, it has no documentation of other green slips from him concerning his release (Johnson Aff. ¶6, and Ex. C-1 through C-3), nor any indication that he made any disturbances which would warrant any discipline. (Id. ¶¶9-10)

A document entitled "ADC Inmate Tracking Sheet" generally referred to as a "court tab" accompanies ADC inmates to each court appearance and is used by the courtroom deputies to note information concerning the next hearing as well as conditions for release. ADC personnel rely on that document, as well as the SIP computer entry, to inform them of an inmate's detention status. (Johnson Aff.¶ 11, and Ex. F; Anderson Aff. ¶3). Both the SIP computer record and the ADC's court tab indicated that plaintiff's release status was "CR" (conditional release) and "no contact," not "NBR" and "no contact." (*See* Beitz Aff. Ex. I, p. 1 and Johnson Aff. Ex. F). When the court orders an inmate released on "conditional release," a representative from the probation office will meet with the inmate concerning the conditions and, after that has occurred, signs the inmate's booking sheet or another release

document informing the ADC Records Unit personnel to commence the necessary paperwork processing precedent to the inmate's physical release.  When that paperwork is accomplished, Records Unit personnel notify the deputy staff to physically release the inmate. (Johnson Aff. ¶12; Anderson Aff. ¶4, Ex. G).  There is no documentation to suggest that a probation officer met with or signed Mr. Russell out before November 15, 2000.  (Johnson Aff. ¶13).

In November 2000, ADC Records Unit staff had a procedure for monitoring conditional release cases when the inmates returned from court.  The inmates' paperwork was placed in a designated location to be accessed by the probation staff.  If the probation staff did not process sign the appropriate authorizations, ADC Records Unit staff placed the paperwork in a "check daily" file.  As the name implies, In Custody Records Unit staff would then, on a daily basis, attempt to follow up with the probation department and/or the appropriate judge to clarify the inmate's situation.  Records Unit staff generally documented their efforts only with "post it" notes which did not become part of the inmate' permanent file.  Thus, in the instant case, no documentation exists of any such efforts that may have been made by ADC Records staff between November 9 and November 15, 2000.  (Anderson Aff. ¶5-6, Johnson Aff. ¶13). However, on November 15, 2000, at approximately 11:10 a.m., the ADC received by facsimile, a form court order entitled  Modification of Sentence/Commitment. (Johnson Aff. Ex. E).   The form court order was signed by Judge Hartigan and stated, "Defendant should be NBR with no contact with victim rather than CR."  ADC records indicate that plaintiff went through release processing, received his property, and was out the door by approximately 1:50 p.m., approximately 3 hours after the ADC received notification of his modified release

status. (Johnson Aff.¶14).  Plaintiff agrees that he was released by that time.  (Beitz Aff. Ex.K, p. 66 line 15 – p. 67 line 23).

It is not clear how the modification came to be sent to the ADC.  Although no ADC records document the "check daily" monitoring process, the name "Dottie" on the form would be consistent with the hypothesis that Dottie Schwantz, a Custody Records Coordinator at the ADC, (Anderson Aff. ¶7) had been monitoring the situation, and had finally reached the probation officer who obtained the judge's order on that date.   It is also possible that plaintiff's lawyer contacted the probation officer who then obtained the judge's changed order.

Plaintiff was sentenced on February 22, 2001.   He was given a stay of imposition of sentence with a 53-day term at the ACF as one of the conditions.  He was given 53 days credit against that sentence for the time he spent at the ADC. (September 26 - November 15 is 51 days.)  (Beitz Aff. Ex. J).

## LEGAL STANDARD

Summary judgment prevents insubstantial and unsubstantiated claims from going to trial, and is appropriate if there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)(quoting Fed.R.Civ.P. 56(c)).  A fact is material only when its resolution will affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When the moving party files a properly supported motion, the adverse party may not rest upon allegations or averments of his pleadings; the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute for trial.  Fed. R. Civ. P. 56(e); *Celotex,* 477 U.S. at 324 (1986).

**LEGAL ARGUMENT**

**I.     The Individual Defendants are Entitled to Judgment**

The individual defendants are entitled to judgment because none was personally involved in plaintiff's incarceration.  Further, Chief Deputy Smolley is not an ADC policymaker (Smolley Aff. ¶ 4, Ex. A); Inspector Merkel was not a County employee (Merkel Aff. ¶ 3); and this court lacks jurisdiction over Richard Esensten.  (Esensten Aff. ¶2)

**II.     Defendants are Entitled to Judgment on the Constitutional Claim**

    **A.     There Was No Violation of Plaintiff's Fourteenth Amendment Rights**

"The first inquiry in any §1983 suit . . . is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker v. McCollan*, 443 U.S. 137, 140 (1979). If the answer to this inquiry is no, then there is "no claim cognizable under §1983." *Id.* at 146-147.  Plaintiff alleges that defendants violated his rights under the Fourth and Fourteenth Amendments to be "free from unreasonable seizure of his person" pursuant to established policy or custom of Hennepin County and its Sheriff. (Complaint ¶11).   The Fourth Amendment has no application to this case.  The Supreme Court has held that the Fourth Amendment's prohibition against unreasonable seizures of the person applies to claims that "arise [] in the context of an arrest or investigatory stop of a free citizen," *Graham v. Connor*, 490 U. S. 386, 394 (1989). Plaintiff was not a "free citizen" on November 9 - 15; he was a convicted criminal.  *See* Minn. Stat. §609.02 Subd. 5(1).  In *Luck v. Rovenstine,* 168 F.3d 323, 326 (7th Cir. 1999) the Seventh Circuit stated that the constitutional provision applicable to period of confinement before a judicial finding of probable cause is the Fourth Amendment,

but after that, it is the Fourteenth.  The court also stated that the Fourth Amendment standard is stricter. Since plaintiff's detention occurred after a judicial finding of probable cause, the only relevant constitutional provision is the Due Process Clause Fourteenth Amendment.

Defendants concede that, after the lapse of a certain amount of time, the plaintiff has a Fourteenth Amendment right to release.  Under the facts and the applicable Fourteenth Amendment standards, however, plaintiff's constitutional rights were not violated by Hennepin County or the Sheriff in his official capacity as a policy maker.  The test applied in Fourteenth Amendment cases is whether the government engaged in "conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty."  *Moran v. Clarke,* 296 F. 3d 638, 643 (8th Cir. 2002)(citations omitted).  The facts of this case do not.

While there is a factual dispute about how many times the plaintiff interacted with deputies in his housing unit and what he may have been told about his release status, there is no dispute concerning the legally significant fact with respect to his release: that ADC employees at all times were acting in compliance with an unambiguous order of the District Court that plaintiff be released only when authorized by the probation staff.   Indeed, the court's need to issue of a Modification Order supports the conclusion that ADC staff properly interpreted the information available to them but, despite the records to the contrary, that conditional release status was not intended by the Court.

The Eighth Circuit has held in several cases that sheriffs or jailers who act in good faith reliance on facially valid court orders are absolutely immune from liability for civil rights violations under 42 U.S. C. §1983.  *See e.g, Penn v. U.S., et al.,* 335 F. 3d 786 (8th Cir. 2003)(extending quasi judicial immunity to officers acting in reliance on facially valid order of

Native American tribal court); *Martin v. Hendren,* 127 F.3d 720 (8th Cir. 1997)(holding deputy absolutely immune for carrying out judge's order to handcuff plaintiff and remove him from courtroom); *Patterson v. Von Riesen,* 999 F.2d 1235, 1240 (8th Cir. 1993) (holding prison warden immune for continuing to hold plaintiff pursuant to valid court order in face of prisoner's claim he was wrongfully convicted and citing *Francis v. Lyman,* 216 F. 2d 583 (1st Cir. 1954) for the proposition that providing immunity to jailor for holding prisoner pursuant to judicial process regular on its face is ". . .time-honored in the Anglo-American common law. . ."); *Tymiak v. Omodt,* 676 F.2d 306 (8th Cir. 1982) (holding sheriff immune for evicting plaintiff in reliance upon a facially valid writ of restitution).

Stating that "false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official," the Supreme Court found no violation when an individual mistakenly arrested under a warrant issued for another was detained for several days.[1] *Baker,* 443 U.S. at 146. While stating that after the lapse of "a certain amount of time," a constitutional violation might occur, the Court held three-days "<u>does not and could not amount to such a deprivation.</u>" *Id.* at 145. (emphasis added). Following *Baker*, the Eighth Circuit and other courts have considered how many days must elapse before an erroneously arrested individual has experienced a constitutional violation. Although not directly on point, these cases are instructive and support Defendants argument that six days at issue here do not meet the threshold of unconstitutionality. The Supreme Court has also held that the due process clause is not implicated by random, negligent acts of an official causing unintended loss of liberty or property. See, e.g., *Daniels v. Williams,* 474

---

[1] The total detention was seven days, but the named defendants were responsible for only three of the seven.

U.S. 327, 328 (1986); *Davis v. Cannon,* 474 U.S. 344 (1986).  That appears, at most, to be what occurred here.

The Eighth Circuit has also held that deliberate indifference, not mere negligence, is necessary to state a constitutional claim.  Thus in *Kennell v. Gates,* 215 F. 3d 825 (8th Cir. 2000), Sharon Kennell was arrested on a warrant meant for a sibling.  She protested to defendant Gates that she was not the wanted individual and fingerprinting confirmed this.  The evidence suggested that the fingerprint information was transmitted to Gates in due course, although Gates claimed she did not receive it.  Six days elapsed before the plaintiff was released when a probation officer visited her in jail and confirmed she was not the wanted individual.  Plaintiff sued the City, Gates, and other employees.  At the close of evidence, verdicts were directed for all defendants except Gates.  The jury found Gates liable and Gates appealed.  Citing *Baker*, the Eighth Circuit stated "Even assuming that Gates's failure to investigate Sharon's mistaken identity claim further or to inquire about the results of the fingerprint analysis was unreasonable or negligent, those actions cannot amount to a constitutional violation for this six-day confinement."  215 F.3d at 829.  Kennell was able to get to a jury only because she produced evidence that suggested that defendant Gates was deliberately indifferent, i.e., evidence sufficient for the jury to infer that Gates received and read the information confirming that plaintiff's fingerprints did not match those of the wanted individual and failed to act upon that knowledge.  (*Id.*)  The Eighth Circuit stated that "actual knowledge of wrongful detention" was required to establish the deliberate indifference necessary to sustain a §1983 claim.  *Id.* at 830.  *See also, Panfil v. City of Chicago*, 45 Fed.

Appx. 528, (7th Cir. 2002)(holding no due process claim asserted when mistakenly arrested plaintiff spent 6 days in custody) (Beitz Aff. Ex.L).

If it is permissible negligently to detain a mistakenly arrested citizen for 6 or more days, it cannot be constitutionally impermissible negligently to hold a convicted individual for that amount of time, where there is no evidence that suggests any ADC employee had actual knowledge that plaintiff's detention was wrongful.  Plaintiff complains that the ADC housing deputies did nothing to act upon his statement that he was entitled to be released.  Based on the green slips that does not appear to be the case.  The readily available records about what transpired in court did not confirm that plaintiff should be released unconditionally, as he claimed, but that he could be released only after the probation officer signed him out or, as later happened, only after someone reached Judge Hartigan and he modified the terms of the order reflected in the court's record.  In the face of contrary evidence in its records and those of the court, the ADC cannot act to release an inmate simply because he says the court intended for him to be released.

A separate panel of the Eighth Circuit has recently reaffirmed that deliberate indifference is required to state a constitutional claim for prolonged wrongful detention when it held in *Davis v. Hall,* 2004 WL 1562932 (8th Cir. July 14, 2004) that qualified immunity was not available to state prison authorities who, despite his protests, held plaintiff 53 days after the court clearly ordered his immediate release.  *Davis* is distinguishable from the instant case since it involved 53 days of incarceration rather than 6 days.  (*Davis* also involved a claim against county jailers who held him 4 days after court before transferring him to state authorities.  The District Court dismissed that claim as well and the Eighth Circuit declined

10

jurisdiction.) Significantly there was a basis to claim deliberate indifference because prison authorities in *Davis* had no paperwork on the plaintiff authorizing his detention and refused to consult the judgment and sentence order which Plaintiff did possess which clearly indicated that he had no prison time remaining to serve. This is unlike the situation here where the ADC employees were simply acting in compliance with the orders they possessed.

### B.  No Basis Exists for Municipal Liability

Alternatively, even if plaintiff has a triable issue on a constitutional violation, he cannot sustain his claim of municipal liability against the County or the Sheriff in his official capacity as policy-maker. A municipality is responsible only for <u>its</u> constitutional torts and is not vicariously liable for those of its employees based upon *respondeat superior*. *Monell v. Department of Social Services,* 436 U.S. 658 (1978).

#### 1.  No Evidence Exists of an Unconstitutional County Policy or Custom

Official policy involves "a 'deliberate choice to follow a course of action...made from among various alternatives' by an official who has the final authority to establish governmental policy." *Jane A. Doe v. Special School Dist. of St. Louis County,* 901 F.2d 642, 645 (8th Cir. 1990)(citing *Pembauer v. City of Cincinnati,* 475 U.S. 469, 483 (1986).) Minnesota law vests responsibility for the operation of county jails both with county boards and county sheriffs. *See,* Minn. Stat. §387.11 and Minn. Stat. §641.01. Plaintiff has no evidence to create a triable issue on whether the Sheriff or the County Board deliberately adopted a constitutionally infirm policy.

To establish a constitutional violation by governmental custom, a plaintiff must prove:

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

11

    2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

    3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation.

*Jane Doe A.,* 901 F.2d at 646.

*Monell* imposes a stringent standard to establish municipal liability: proof that a policymaker had notice of and deliberately disregarded a persistent pattern of unconstitutional misconduct, i.e., that the County had a policy or custom of deliberately failing to act on, investigate, or remedy constitutional misconduct when such misconduct was brought to its attention. *See, Andrews v. Fowler,* 98 F.3d 1069, 1075 (8th Cir. 1996). Plaintiff cannot point to any affirmatively adopted ADC policy that caused this alleged constitutional violation.

    Plaintiff may seek to rely upon *Oviatt by and through Waugh v. Pearce,* 954 F.2d 1470 (9th Cir. 1992), in which the Mr. Oviatt was detained 114 days without a court appearance because the county sheriff had failed to adopt a system to track the first appearances of arrested individual. In that case, the court clearly indicates that failure to adopt a policy or procedure could be the basis of municipal liability. *Oviatt,* however, is distinguishable for many reasons: First, the ADC did have a procedure in place for tracking the persons who were eligible for conditional release but were not timely signed out by the probation officer, via its "check daily" procedures, although for some reason, it did not produce results for six days in this case. This court can judicially notice that the day following the hearing—Friday, November 10th—was a state and national Veteran's Day Holiday and the weekend followed, and there is

no evidence of record concerning the availability of Probation Officer Butros or Judge Hartigan to clarify the release situation any sooner than they did.

Also distinguishing this case from *Oviatt* is that the plaintiff there established that sheriff knew of 19 similar incidents occurring before Oviatt's incarceration; knew that it was "highly probable" that the absence of an inmate tracking system would result in prolonged incarceration, *Id.* at 1476; met several times to discuss the problem but consciously decided to continue to do nothing, *Id.* at 1477, because it was "more trouble than it was worth to fix the problem." *Id.* at 1473.  There is no evidence in this case that the ADC's procedure normally failed to produce results sooner than six days. In the absence of evidence that the "check daily" system regularly failed, a reasonable jury cannot leap from a single instance to the conclusion either that the Sheriff or County Board had actual knowledge of numerous previous cases of unconstitutional overdetention or consciously decided to do nothing about it.  While deliberate indifference can be shown by "continued adherence to an approach that [policymakers] know or should know has failed to prevent tortious conduct," *Board of County Commissioners v Brown,* 520 U.S. 397, 407-08 (1997), there has been no such showing in the instant case.  *See also, Tilson v. Forrest City Police Dept.*, 28 F.3d 802 (8th Cir. 1994), *cert. denied* 514 U.S. 1004 (1995) where plaintiff was incarcerated 14 months without a hearing but court reversed jury verdict and held that the inaction of the police department and its failure to conduct criminal investigation was not an official policy and, in the absence of evidence that such failures were permanent and well-settled, there could be no basis for *Monell* liability.

## II.     Defendants are Entitled to Judgment on the State Law Claims

### A.     The Claim Based on the Minnesota Constitution Fails to State a Cause of Action

Count II alleges that the Defendants violated Article 1 § 10 of the Minnesota Constitution, which states:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized.

Neither has this constitutional provision been construed to impose civil liability, nor have Minnesota courts implied a general right to a damages lawsuits based upon alleged violations of the Minnesota Constitution. *See*, *Ben Oehrleins and Sons and Daughter, Inc. v. Hennepin County, Minn.,* 922 F.Supp. 1396, 1400 (D. Minn. 1996) (citing *Bird v. State Department of Public Safety,* 375 N.W.2d 36, 40 (Minn. Ct. App. 1985)(holding no cause of action in tort for deprivation of due process under Art. I § 7). *See also*, *Guite v. Wright*, 976 F.Supp. 866, 871 (D. Minn. 1997)(dismissing claim and noting that plaintiff admitted that no private cause of action exists for violations of the Minnesota Constitution).

In Minnesota, not even a statute – let alone a constitutional provision – gives rise to a civil cause of action unless the language of the statute explicitly so provides or it can be determined by clear implication. *Bruegger v. Faribault County Sheriff's Department,* 497 N.W.2d 260, 262 (Minn. 1993)(holding no private cause of action under the Crime Victims Reparation Act and stating, "Principles of judicial restraint preclude us from creating a new statutory cause of action that does not exist at common where the legislature has not either by the statute's express terms or by implication provided for civil tort liability."). Further,

principles of comity and federalism suggest that only the Minnesota Supreme Court — not a federal district court — should recognize a new cause of action.  *See, Lake v. Wal-Mart Stores, Inc.,* 582 N.W.2d 231, 233 (Minn. 1998).  *See also, Golberg v. Hennepin County, et al.,* 2004 WL 1386154 (D.Minn. June 18, 2004) (Beitz Aff. Ex. M).

### B. The False Imprisonment Claim is Time-Barred

Plaintiff's false imprisonment claim is time barred.  The statute of limitations provides that actions for false imprisonment "shall be commenced within two years…."  Minn. Stat. (2002) §541.07.  Plaintiff's incarceration occurred September 27 – November 15, 2000, and his claim arose no later than November 15, 2000, the day he was released.  *See, Mellett v. Fairview Health Services, 634 N.W.2d 421, 424 (Minn. 2001); Zaun v. Halpern*, 382 F. Supp. 2 (D. Minn. 1974) (both holding that claim for false imprisonment accrues on the date plaintiff was released.)  To be within the period of limitations Plaintiff was required to file his action no later than November 15, 2002.  He filed this lawsuit August 11, 2003.  Defendants are entitled to judgment of dismissal.

### CONCLUSION

For all the reasons set forth above, all defendants are entitled to judgment on all claims.

>AMY KLOBUCHAR
>Hennepin County Attorney
>
>By: _____
>TONI A. BEITZ (6245)
>Sr. Assistant County Attorney
>Attorneys for Defendants
>2000A Government Center
>Minneapolis, MN  55487
>Telephone:  (612) 348-8533
>Fax No:  (612) 348-8299

Dated:  August 20, 2004